Yes, Your Honor. You may proceed. Good afternoon. Good morning, Your Honors. May it please the Court. James Ostlander for Appellant National Mining Association. I'll address why plaintiff's complaints are unreviewable and why their remedy is untenable. Mr. Torstensen will then address why the National Environmental Policy Act, or NEPA, was neither triggered nor violated here. We collectively would like to reserve two minutes for rebuttal. This Court should reverse because the District Court has usurped the Department of the Interior's authority to administer its federal co-leasing regulations. Plaintiffs brought this litigation because Interior did not indefinitely pause all federal co-leasing while Interior conducts a consideration of what, if any, policy changes to its governing regulations might be warranted. But it's undisputed in this case, Your Honors, that the Interior has no legal obligation to conduct such a programmatic review or PEIS or to freeze its existing program while it undertakes that review. That much is clear from federal regulations, including 43 CFR 46160 and 40 CFR 1506.1c, and from case law, including the D.C. Circuit's recent rejection of functionally identical claims in Western Organization Resource Council, or the WORC case. The District Court erred in creating such novel obligations and then enacting plaintiff-sweeping policy to end federal co-leasing indefinitely. Rather, like the D.C. Circuit, the District Court here should never should have entertained this dispute entirely contrived by the plaintiffs. Now, perhaps a bit unorthodox, but I'd like to start with the District Court's remedy before turning to why plaintiffs... I guess I'd rather hear from you first on the mootness issue. I'm sorry, Your Honor? I'd rather hear from you first on the mootness, Your Honor. The Zinke order and its NEPA analysis present no case for controversy and are moot because current Interior Secretary Holland vacated them long before the District Court purported to do so a second time, and plaintiffs have not challenged that Holland order. There's no evidence Interior is using or intends to use the Zinke order's NEPA analysis for any purpose. The Zinke order and its NEPA analysis simply are irrelevant and can only yield an impermissible advisory opinion. Moreover, Interior is now in the midst of a programmatic NEPA review of federal co-leasing. Courts and the plaintiffs can't dictate the interim or end policy result of that review, and speculation about how Interior might administer or amend its longstanding federal co-leasing regulations also creates no exception to mootness. The District Court said on ER-15 that the Zinke order still remains in partial effect. Is that Again, this kind of falls back to what the Zinke order is. The Zinke order and the Jewel order did not stop the federal co-leasing program. They did not amend the federal co-leasing program in any way. What they were were discretionary action about how quickly the Department of the Interior would process, receive federal co-leasing applications under its existing program. And the Jewel order set one priority. The Zinke order set a different priority. But at the end of the day, there was no change to the overall program. And again, it's really about speculative contingency. It's about what Interior might do if it chooses to amend its program or what leases Interior might issue. That's unaffected. Interior now is proceeding with a programmatic review, and it's free to do so. But I think it's telling, even just factually, that more leases were issued under the Jewel order than were issued under the Zinke order. Again, that wasn't even a total stoppage. I think that's what I'd like to say about mootness. And again, just one final thing is that any agency actions actually having effect on the ground remain challengeable. Again, it's undisputed. District Court found it's undisputed that NEPA has to be done before actual federal co-leasing begins. NEPA has to be done before the Department of the Interior proposes and changes its regulations. But there is no proposed major federal action or final agency action that happens here. And the Zinke order is gone forever. There's no indication it's ever coming back, such that that's the only issued action, this posted action in this case, and it's gone. So there's really nothing more for the court to decide in this case on the Zinke order. If the Court will permit me, I'd just like to talk about remedy for two reasons. One's being completely transparent. That's really the reason we're here. Though plaintiff's complaints are baseless, this appeal might have been unnecessary if the District Court hadn't manufactured an indefinite prohibition on federal co-leasing. Interior can elect to undertake or not undertake a programmatic review. It's free to do that. But here the District Court stopped leasing indefinitely until a proper or an acceptable NEPA review that passes muster with the District Court and plaintiffs is prepared. And the order remedy really crystallizes the central fiction underlying the plaintiff's entire complaints in the District Court's merits and jurisdictional rulings. They misportray two orders, and you have to look at both orders together, by Interior Secretaries Jewell and Zinke, as simply ending and restarting all federal co-leasing. And based on that false premise, the District Court purported to vacate the Zinke order and reinstate the Jewell order. But the District Court said one thing while doing something completely different. In reality, the District Court effectively rewrote the Jewell order to convert its PEIS and pause from voluntary to mandatory just because they had begun. Moreover, the District Court divorced the Jewell order's temporary pause on processing certain federal co-leasing applications from the Jewell order's sole condition precedent for such a pause. What no one disputes was a voluntary and exploratory PEIS. The PEIS and pause were inseparable under the Jewell order. And the Jewell order found that the PEIS warranted a pause, not the other way around, that the pause warranted a PEIS. But the District Court somehow derived a mandatory injunction on federal co-leasing and did so even without assessing the Supreme Court's required Monsanto factors for injunctive relief. And what's more, that leasing prohibition remains until such time that Interior produces a NEPA document acceptable to the District Court and the plaintiffs, which, as Mr. Torstensen is going to discuss, it's the same scope as the Jewell order PEIS that Interior began and then ended. This Court cannot affirm the District Court's remedy without making a first-of-its-kind ruling that a voluntary NEPA review, once begun, becomes mandatory to complete. The District Court ordered the equivalent of the Jewell order PEIS, despite recognizing that it couldn't do so. Nor did the District Court say what specifically was missing from the Interior NEPA review for the Zinke order. Despite recognizing at the first summary judgment hearing its obligation to do so, the District Court there said, well, what if I were to rule in your favor? I think at a not just say, well, this isn't good enough. Why don't you give it another crack, end quote. Yet, the District Court ordered just that in the end. And again, beyond muteness, there's also no final agency action to give subject matter jurisdiction here because it doesn't pass the Bennett v. Speer standard. Even if a secretarial order ever could constitute final agency action, which no Court has ever found, the specific orders here don't do that. On the first Bennett factor, rather than consummating anything, the PEIS and PAWS were a first step to explore possible policy reforms. That's all they were. Nor did the Zinke order create or alter the rights of any party or lease a single acre or ounce of federal coal. Rather, the Interior secretarial orders here cover merely internal management of agencies and speak only to Interior staff, not to any regulated entity. They expressly, by their terms, create no legal rights or obligations for anyone. That is, if Interior had in fact... You might want to spend some time for rebuttal, and we'll let you have that. But didn't the Jewell order put in place a temporary moratorium? No, Your Honor. What the Jewell order did was order a programmatic environmental impact statement and put a PAWS in place for the sole purpose of completing that environmental impact statement. Okay. But is that not a temporary moratorium? No, Your Honor. What it is, it's an order. It is tied to prepare an environmental impact statement. For the purpose of that impact statement, it's stated that the Interior should withhold a decision on certain types of leasing applications until the results of that order came in. It's really no different than, say, a press release or an internal email from an agency official to his or her subordinates. It's just inherently exercising discretion about where the agency is going to prioritize its resources. But it could have continued the coal leasing program while it was preparing the PEIS, right? Correct, Your Honor. And the Zinke order wasn't even necessary to end the Jewell order. And the temporary moratorium would not have Yes, it would have, Your Honor. Automatically? Well, what the Jewell order said... The PEIS said, we've got to stop. We've got to stop coal leasing. The moratorium would have stopped, and then they would resume leasing, even though the PEIS said don't? Well, again, I think you have to look at what the... The two acts can't be independent of each other, counsel. The PEIS, the Jewell order linked specifically the PAWS to completion said, until completion of the PEIS, the district... But the moratorium wouldn't have expired automatically upon the issuing of the PEIS. I think Interior would have had to say, based on the results of the PEIS, if it would have found that certain reforms were needed and it needed to do, it would have had to issue a subsequent order or direction to it. Because again, you have to look at what the order actually said. It didn't say, don't issue any coal leases until X date or whatever. Again, because if perfectly result of the PEIS would have been, don't change anything. Just keep it going the way it was, like it was in 1985, very few changes from that supplemental program at PEIS. Actually, the program largely continued as it was before 1979, just with very minor changes. So again, it's just pure speculation about what would have happened after the PEIS was issued, if Interior would have said, no more leasing. It really needs to ride together. This was not a stoppage or a change in the underlying regulatory scheme. I do see my time is up. Counsel, if Judge Bress doesn't mind, I have one question for you. Please. If we were to vacate the district court order and remand with instructions for the district court to dismiss as moot, what's the harm to your client, if any? If this court reverses the district, if I understand the question correctly, Your Honor, if this court reverses the district court and dismisses the case as moot, what is the harm to my client? I think what I said was if we vacate the district court order. Right. Well, in that event, there would be no harm to the client because, again, there would be no injunction anymore on federal co-leasing. Whatever decisions Interior might make about its regulations or about any particular application would become ripe when those decisions are made. Okay. Thank you. Thank you. I'll defer to Mr. Torstenson to explain why plaintiffs can't prevail, even if this course proceeds to the merits of the NEPA claims. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Peter Torstenson on behalf of the states of Montana and Wyoming. Plaintiff's case hinges on the fiction that the Juul order set the status quo for all federal co-leasing and the Zinke order changed it. But that house of cards topples on closer inspection. This court should reverse for two reasons. First, the Zinke order cannot be a major federal action because it didn't change the regulatory status quo. For more than 40 years, all federal co-leases have been evaluated under the federal co-program, even during the Juul order, nor the Zinke order altered or amended the federal co-program, so that program remains the regulatory status quo. Second, even if NEPA applies, Interior's EA was sufficient. But plaintiff's real beef isn't with Interior's EA. It's with the federal co-leasing program. Even though they frame their complaints in terms of NEPA compliance, they really want Interior to create a new federal co-program from scratch. And despite saying that the EIS was not an available remedy in this litigation, the district court ordered precisely that. That was error and this court should reverse. I'll begin with why the Zinke order was not a major federal action. We believe that the D.C. Circuit's recent decision in the Western Organization's Resource Council case, or WARC, is directly on point. There, the court held that Interior has no duty to update its existing federal program unless it proposes formal changes to its federal co-program, because the major federal action on the federal co-program was complete with the issuance of the 1979 PEIS. Yet the district court held that the Zinke order's lifting of the leasing pause was the major federal action that was missing in WARC, even though the when it reached its conclusion. It found that the plaintiffs had, quote, failed to identify any specific pending action apart from the program's continued existence that qualifies as a major federal action, end quote. Indeed, the court stayed the case during the dual order and it reset the briefing schedule after the Zinke order was issued. So if the Zinke order really was the missing major federal action, it seems passing strange that the D.C. Circuit failed to mention that in its opinion. We think the more natural inference is that neither order was a, or the D.C. Circuit believed that neither order was a major federal action. And that's supported by its recent decision in the Environmental Health Trust case, which is at 9F4893. With the issuance of the dual order being major federal action? We do not believe that it would have been a major federal action. It was issued pursuant to a secretarial order. Generally speaking, these secretarial orders are intended to guide the internal agency management. The secretarial orders all indicate they are, that they provide no legal rights or remedies. They're not intended to create any legal rights. But it did, at least part of the order's effect was to put a pause on leasing with some exceptions, right? Sure. It puts a pause on leasing with some exceptions. As Mr. Oslender indicated before, there were leases that were issued during the dual order. It's the composition of leases that are actually different. So before, you know, once the dual order was implemented, there were certain leases that would be processed. And the text of the dual order indicates that, like all non-exempt leases, they would be deferred until they complete the actual, like, the voluntary programmatic review. But at that time, I mean, couldn't a person who is aggrieved by that have a claim as to the dual order, whether it's your clients or Mr. Oslender's? We're unaware of any case in which a party has challenged a secretarial order. Plaintiffs point to none. The district court pointed to none. And we see nothing in the text of the dual order that creates any specific legal rights. It might be a different case if they deemed the applications denied at the time. Then maybe there's an argument that those were, in effect, like, reaching conclusions on the legal rights of the parties with those lease applications. Could you have brought a challenge to the dual order? Could we? Yes. I don't believe we could have brought a challenge to the dual order. No. Including the temporary pause? Including the moratorium on co-leasing? I mean, there might be a basis for asserting that there's some ultra-virus action in terms of, like, acting with, like, that the secretary was acting kind of beyond their statutory authority under the Mineral Leasing Act. But aside from that, no, I don't, I'm not unaware of any legal challenge that they could have brought to that. Counsel Judge Gould, if I could ask you a question. I may be missing something, but I'd like to know, from your perspective, if our panel were to vacate the district court order and to remand the case to the district court with instructions to dismiss, what's your position? Yes. As Mr. Oslinder indicated, if the panel were to vacate and remand with instructions to dismiss, we don't believe that we would be harmed by that. We believe that, yeah, we don't believe that there would be any harm in that indication or in that ruling. Thank you. Thank you. So, returning to the Environmental Health Trust case, so similar, as I said, we believe that the more natural inference there is that neither order was of major federal action, and the Environmental Health Trust case supports that. The federal, the FCC had issued guidelines on RF radiation limits in 1996. Those were supported by NEPA analysis, and then in 2013, they undertook a voluntary review and then abandoned it six years later. Relying in part on the WART case, the court held that there was no duty to update their 1996 guidelines without a major federal action pending, and they said that the start and stop of the notice of inquiry into the 1996 guidelines did not change that analysis. And they further proposed that a major federal action could be pending if there were amendments that were offered to the existing regulatory program, similar to the case here. And we think that if the court were to endorse the district court's ruling, that it would have to depart from the rationale of both the WART case and the Environmental Health Trust case. And we also think that there are a few more reasons that the Zinke order does not constitute a major federal action. First, an agency's discretionary decision can't change the status quo unless it alters the existing legal framework, and the Juul order, as we've discussed, does not create any legal rights. And so the Zinke order's rescission of it doesn't change the status quo by rescinding it. No party, again, pointed to a case in which NEPA, or a case that had sustained a NEPA challenge to a secretarial order, and the cases that instances in which there had been NEPA analysis performed on an existing rule or regulation, and then a later decision attempted to undo that. What if the secretary said, we're just not going to, we're going to stop issuing leases? I believe that the secretary would have come in then and said, wait a minute, before you do that, you have to take some account of how this is going to affect the, you know, the well-being of an economy of people that will be, that will suffer as a result of this. Yes. I don't believe that the secretary has discretion under the Mineral Leasing Act to permanently pause all coal leasing. And so to the extent that they said that we are not going to issue any leases at all, I think that there would be a basis to challenge that. I think to the extent that the secretary elects to reprioritize their discretion, there are obviously, that's a different question. We won't, we're going to have a pause until we issue a PEIS. And the PEIS went out over years and years and years and years. And the secretary said, well, we're still working on it, but effectively it goes off beyond three years to five years to seven years. You have a writ of mandamus to issue a PEIS? Can this court order the secretary to issue the, to issue the PEIS so that the coal leasing program can either go up or down? I mean, I think that's a great question. I'm not precisely sure where that sort of line would be drawn, but I do believe that there would be some indication or some need for that at some point. I mean, here, obviously, we're dealing with a one-year pause. What if the secretary gave an internal order to take a really, really hard look, not just a hard look, but a really, really hard look? I see that my time's out. Please go ahead and answer. And that had the effect of, you know, as it was intended, to chill the approval of any coal leases. Is that reviewable? And would you have an action here? Would you be in here saying, this is, this is not, these are not the same standards under which the secretary has previously conducted this program, and therefore it is a major federal action? It discourages? Yeah, I do think that there are, there are instances where if the secretary's actions begin to reflect things that change the formal legal rights and obligations of the parties before them, then there would likely be some basis for challenging that. I think your hypothetical appears to get closer to that potential line. I'm not sure that that would necessarily go beyond their actual discretion, but I do think that there might be more something to explore in that particular instance. It's, I don't believe that's what we have here, but I do think it would be a closer call. Okay. Why don't we now hear from the appellees? And we'll, we'll have two minutes for rebuttal for the appellants. Good morning, Your Honor, and may it please the court. I'm Sam Harbert on behalf of the Plain of States. I plan to focus this morning on the questions of jurisdiction. Final agency action and major federal action. My colleague, Ms. Harbin, on behalf of the organizational and tribal plaintiffs, plans to focus on the adequacy of the environmental assessment and the question of the proper remedy. Is one of you going to address mootness? Yes, Your Honor, I was about to say I would like to start with, with mootness. So I think there are really two reasonable ways to view the mootness issue here, and they both lead to the path the district court took, which was to say, despite what the Holland order may suggest on its face, the federal government is appearing before me in court and in its filings saying that under the Holland order, we have authority to issue new federal coal leases tomorrow without undertaking the environmental review that the plaintiffs argue is, is necessary, that we argue is necessary in this case. So for that reason, the Holland order did not, in the federal government's view, did not change the moratorium rescission under the Zinke order. Right, but that would seem to be an issue with the Holland order. Well, Your Honor, that brings me to the second reasonable way of looking at this, which is to say, setting aside what the federal government was saying in its filings to, before the district court or in the federal register notice on this, that, that the Holland order does on its face purport to rescind the Zinke order in full, that would be a voluntary cessation of the challenged conduct. But voluntary cessation does not moot a controversy unless the party invoking mootness principles, and here, that's my friends on the other side, demonstrate that it is absolutely clear, absolutely clear that the challenged conduct could not reasonably be expected to recur. And here, I, I don't know how my friends on the other side could credibly make that showing when the federal government is appearing before the district court saying in a very real that the challenged conduct has already recurred, that we intend to exercise authority to issue new federal coal leases without first undertaking the Nieper review that we argue is legally required. Right, but this is a getting into a question of essentially traceability and redressability because the case began and remains a challenge to the Zinke order, and that order has been formally revoked by Secretary Holland. So there may be some other challenges out there to Secretary Holland's order or to the BLM's interpretation of that order, but that's not this case. With respect, Your Honor, I disagree. So as, as to standing, standing is assessed at the beginning of the litigation, and we demonstrated standing under this court's well-established procedural violations standard at the inception of the case. Any questions that arise after the initiation of litigation are mootness questions, not standing questions, and a voluntary cessation of the Holland order purports to do on its face, which is to accomplish a voluntary cessation, but that does not moot the controversy unless it is absolutely clear that the challenge conduct will not recur in the future. And the proper remedy in a case of voluntary cessation is to provide declaratory relief, which is essentially what the district court did here. It said, it said that the, the rescission of the dual order moratorium needed to be accompanied by certain environmental review under NEPA, and that the environmental assessment prepared by the federal government did not satisfy NEPA's requirements. If I could, Your Honors, turn to another question of jurisdiction, which is this court's appellate jurisdiction as to some of these threshold issues like final agency action under the APA and major federal action under NEPA. This court lacks jurisdiction to review those before the entry of the first judgment in this case, which was in May 2020, and neither my friends on the other side nor the federal government filed an appeal after that final judgment. But didn't you file, didn't you file a new complaint under the same docket number? We, we, we did move for leave to file supplemental complaints under Rule 15. You could have filed an entirely new action under a new number, and that might have foreclosed the whole thing. When you filed it under the same, doesn't that reopen the case? It does not, Your Honor, and I confess. What did it do? Your Honor, it, it, it initiated the equivalent of a new proceeding or new lawsuit. No, but it didn't. It, it, you reopened under the same docket number. That, I mean, the docket number feels pretty ministerial, but it also feels like a pretty big symbol that this is the same case. Your Honor, the reason for proceeding by the supplemental complaint procedure were for reasons of administrative convenience that we spelled out in our motion for supplemental, for the supplemental filing. But what I, I point you to, Your Honor, is an analogous context where this Court has, that this Court has addressed in cases like Harmon v. Harper, and that's 7F3rd 1455. And it's not quite the same as this case, but it's very close, which is where a district court enters an initial judgment. The time to appeal that judgment expires, and then the district court grants leave under Rule 60B to allow further proceedings in district court. And what this Court held in Harmon, consistent with other federal appellate courts, is that at the culmination of those Rule 60B proceedings, all that can generally be appealed are issues that arise post-Rule 60B grant, not issues that arose... That's a function of the rules, right? I mean, here we're looking at a somewhat unusual situation where the district court entered the final judgment. I'm not frankly sure what the appellants would have had to appeal at that point anyway, because the case was, was not necessarily decided adverse to them. But then the district court reopened the case. And so all of these rulings that you're talking about that led into the final judgment, I think now are better reviewed as just simply interlocutory decisions along the way to what is now the ultimate final judgment. So it seems awfully difficult to fault them for not appealing back in the day, given the way this litigation then progressed. I respectfully disagree, Your Honor. And I think because the, the issues decided final agency action and major federal action, if those had been reviewed on appeal at the time, I mean, it could have foreclosed any further proceedings at the district court level. But if, if Your Honors disagree and exercise jurisdiction over those issues, we would ask the Court to affirm. So as to final agency action, the moratorium termination was recently treated as final in this Court's Environmental Defense Center case. That involved a very similar action where the federal government terminated a temporary moratorium on approvals of certain forms of offshore fracking. There, just as here, the, the termination was definitive. It wasn't interlocutory or tentative. And it had the important legal consequence of barring federal officials from approving new site-specific... But it was just a three-year moratorium. Was there a moratorium in perpetuity, or was there a three-year moratorium? In this case, Your Honor, or in... In this case. We, we would characterize the moratorium, it, we're not suggesting that it was intended to be permanent, but it was indefinite or ongoing in the sense that, as Your Honor suggested in a colloquy with my friend on the other side, that it had no automatic termination date. So it was set to remain in place until, and this is in Section 5 of the Juul Order, until completion of the PEIS. But completion of the PEIS is not an automatic or self-executing event. That's something that required further agency action, specifically the adoption of a document called the Record of Decision. That's discussed on page 559 of the Supplemental Excerpts of Record. That's where a final determination would have been made about whether it would make sense to adopt any of the reform proposals coming out of the PEIS. And Your Honor, that's significant for NEPA purposes, because the relevant baseline or status quo from which you measure environmental effects in a NEPA case is the no-action scenario, where you imagine what would happen if the relevant federal agency took no further action. And here, that would be a continuing moratorium. So that's how we would characterize it, Your Honor, as indefinite or as temporary. That doesn't somehow categorically exempt its rescission from NEPA. The relevant standard for identifying a NEPA-triggering event is what this Court has consistently referred to as a low bar or a low threshold. So in cases like California XREL Lockyer or Solar Energy Industries Association, where the Court made clear that the only question for purposes of identifying a NEPA-triggering event is whether the relevant federal action raises a substantial question about whether there may be a significant environmental effect. And here, in light of the profound environmental consequences threatened by the moratorium rescission, the District Court rightly held that at a minimum, that threshold, that low threshold was satisfied. So the DOI does issue an EA, and you don't like the EA because it treats the whole thing sort of at the margins. That is, it says, look, you just lost two years because that was the time frame that was contemplated by the Juul order for issuing the PEIS. You have now treated the EA as though they had to issue an EA that predicted how the PEIS would have come out and sort of told us, then, that you're going to have to conduct the PEIS. I don't understand how we issue an EIS on an EIS. And, Your Honor, let me... It feels, it feels, it feels very regenerative and reiterative and feels a little strange. I understand Your Honor's concern, and I'd be happy to clarify, although I see my time is... Go ahead, keep going. So I'd be happy to clarify that the environmental review we're requesting here is not equivalent to the PEIS that the Zinke order abandoned. The scope, there's certainly some overlap, but the scope is quite different. The scope of the PEIS was broader in a couple of, at least a couple of respects. So what should the PEA have covered? The EA should, at a minimum, and I believe my colleague, Ms. Harbine, will speak about this in more detail, but at a minimum, it should have correctly identified the baseline, which was an acknowledged and measured the environmental effects of lifting that indefinite or ongoing moratorium, including, including grappling with the serious climate change related effects, including the threat, the threatened 1.1 billion tons in additional annual greenhouse gases per year. The EA itself actually calculated that figure, but it didn't take ownership or responsibility for it. Counsel suggested the secretary did not have the authority to issue a permanent moratorium as a secretarial order. Do you have a response to that? Yes, Your Honor. We, we respectfully disagree. Now, again, we don't read... And they could have come in immediately and challenged the Juul order on that basis. We think the Juul order was final agency action that, that could have, that could have been challenged. They didn't bring that challenge. In terms of the interior secretary's authority, the secretary of interior, and Secretary Juul laid this out in the Juul order itself, enjoys quite broad discretion under the Mineral Leasing Act in terms of how to administer and manage the federal coal leasing program. So we do believe that a so-called no, no new leasing alternative would be consistent with the interior secretary's authority. And that was one of the candidates seriously on the table for consideration as part of the PEIS, essentially a permanent extension of the moratorium. So that... Right. But that would have been the result of the PEIS. This gets us back again to this reiterative process in which the EA has to tell us what the PEIS would have looked like. So we know what kind of environmental impacts would have, would have come out had they proceeded with the, with the PEIS. Again, it feels very, very strange. And so, Your Honor, just to be clear, we're not necessarily saying that the EA here needed to make a predictive judgment about how the PEIS would have come out. What it needed to do was, you know, accurately measure the environmental effects of recent, of going back to coal leasing approvals from the indefinite or ongoing moratorium imposed by the Juul order, and then address potential alternatives to the Zinke order's decision to immediately and on a nationwide basis... But that didn't mean that any, that any leases would be issued. It just sort of put it back in the status quo. It would, it would be that... And you were perfectly free to challenge every lease that the Zinke, that the Zinke's DOI issued. That's true, Your Honor. Although the court has made clear in a number of cases that an agency's kind of promise or intentions of, of engaging in additional environmental analysis at a site-specific level do not relieve it of its NEPA obligations at the programmatic level, if it undertakes a programmatic level major federal action as it did here. But at this point, this starts to sound artificial because we're talking about a Zinke order that doesn't exist anymore, right? So we're actually, we're having to go back and say, this is what Zinke should have done at the time, but we now know that that entire order has been revoked. Your Honor, and I appreciate that that is, you know, a somewhat odd dynamic, but I think that it's just inherent in the voluntary cessation doctrine created by the Supreme Court, which is that when a party has standing at the inception of a case, and then there's a subsequent development that, you know, changes the... Right, but not, I mean, voluntary cessation is usually when you do so in response to the litigation. It seems that that is not what happened here. It seems that this new administration has decided to have a different policy than the prior one. That doesn't, that's not in reaction to a district court decision. That's just a change in administration. And Your Honor, involuntary cessation absolutely applies in those types of scenarios. I'd point the court, for example, to the Supreme Court's recent decision in West Virginia versus EPA, where there was a change across administrations and the court held that, you know, that was not sufficient to move the controversy under the voluntary cessation doctrine. Right, but what we're talking about here is not just the change administration. We're talking about the revocation of the order that was what produced the lawsuit in the first place. And that was, that was the same scenario the Supreme Court addressed in West Virginia, that the rescission of the policy that, the Clean Power Plan that produced the lawsuit at issue. Do you agree, the district court described the Zinke order as still remaining in partial effect. Do you think that's the right way to think of this? I think that that is one reasonable way to think of it, based upon the statements made in the federal register and in litigation briefs filed before the district court. But as I mentioned a few moments ago, the second kind of alternative path here to finding the case not moot would be to take the Holland order on its face and hold that my friends on the other side have not satisfied the high bar for showing a voluntary cessation-based mooting event. Okay, well, we've let you go over. Why don't we hear from your co-counsel? Thank you, your honors. Thank you. May it please the court, Jenny Harbin for the Northern Cheyenne Tribe and the conservation organizations. My argument, as Mr. Harbin indicated, will focus on issues pertaining to the district court's 2022 order, namely NEPA compliance and remedy. But I do want to address, given your honors' questions about mootness, that issue just briefly first, which is to note that mootness is different in the NEPA context. This court explained in the Cantrell case that litigants face an especially heavy burden to demonstrate mootness when NEPA compliance is at issue, because in NEPA cases, the harm is, in addition to the harm on the ground, there's a procedural harm here. And ordering an agency to go back and evaluate alternatives or mitigation measures, even after a challenged action is completed, as it was in the Cantrell case, that there were some historic buildings on a naval base that had — were at issue in plaintiff's complaint that were subsequently demolished. The Ninth Circuit said even in a case like that, remanding for further review is partial effectual relief sufficient to rescue a case from mootness. And that certainly applies here. So, counsel, so if the — if the Juul order had said we're going to have a moratorium that we contemplate will last about three years pending the issuance of a PEIS, so let's suppose that the PEIS proved to be a much more difficult process. And at the end of three years, Secretary Juul says, well, we're still working on the PEIS. It doesn't seem fair or proper to extend the moratorium any longer. So we're going to undo the moratorium. And I'm instructing staff to redouble their efforts to get the PEIS out. All really good faith above board. Boom, you are in here, aren't you? Absolutely. Yeah, that's a major action. And that suggests that — here's the point, counsel — that suggests that no Secretary of the Interior should ever tie their hands in the future by taking such a step. The important thing here, and this is an unusual case, when Secretary Juul imposed the moratorium, it wasn't just to do some paperwork. It's because Interior made a determination, regardless under what administration the Secretary served, Interior made the determination that reforms were needed to the coal leasing program to satisfy Interior's statutory obligations under FLPMA and the Mineral Leasing Act. That was stated in the Juul order. It was re-emphasized in the 2017 scoping report just two months before the Zinke order issued that reforms were needed to the federal coal program. And Interior said at the time, in light of this need for reforms, it does not make sense to continue to issue new leases under outdated rules and processes that may not satisfy Interior's statutory obligations. That's in the supplemental excerpts at page 715, again at 720. And this is important. We've talked a lot about what the agency's obligation is to forecast what would have happened if the Zinke order hadn't revoked the Juul order. The key from this court's case law is you have to make reasonable judgments in that case. And here, Interior seemed to acknowledge that the baseline for its environmental review for the Zinke order was continuation of the Juul order. And so counsel, is your position that opposing counsel's clients could have come in and filed a NEPA suit as soon as the Juul order came out? I think there'd be a question there of whether an order that maintains the status quo... No, this is an order that issues a moratorium. Oh, if... The original Juul order issues a moratorium. So opposing counsel's could have come in, under your theory, and filed a NEPA suit against the Secretary for taking major federal action in enacting a temporary moratorium pending the preparation of a PEIS. In such a case, the court would have to grapple with the Douglas V. County line of precedent and ask whether maintaining the status quo through the issuance of a moratorium was a major federal action. My clients... They're not maintaining the status quo. The status quo was that they could issue leases. The Juul order changes that and issues a temporary moratorium pending the completion of a PEIS. Now, if that's major federal action, to enact a temporary moratorium, then the National Mining Association of Wyoming and Montana, under your theory, could come in and file a suit demanding that NEPA be complied with before they issue that major federal action, right? I think it's a question whether or not that would be the case. I was surprised to see... Why would that be the case? You just told us that this was a major federal action to issue this order. It was a major federal action, certainly, to lift the moratorium and commit to environmental... But not to issue the moratorium in the first place, only to undo the moratorium, which would reinstate the prior status quo? My clients don't have a position whether or not the Juul order itself was a major federal action. I was surprised to hear my friends here today say that it was not. There was absolutely a case pending in Kane County, Utah, challenging the Juul order on NEPA grounds that was subsequently dismissed without prejudice, and I'm not aware of any refiling of that case. But regardless of whether the Juul order was a major federal action, the Juul order had prevented most federal coal leasing. At the time, Zinke's Interior evaluated that order. It said the moratorium was impeding coal production, even threatening some mine closures. And so in this NED memorandum, they said it's important that we revoke the moratorium in order to reverse these impacts. And they touted this as an historic action to revitalize the coal industry. But the EA, when it got around to look at the impacts of revoking that moratorium, illogically concluded that it had no impact whatsoever, not for coal production, not for the climate, air, water quality, tribal cultural resources, no impacts whatsoever. And this deeply flawed conclusion stemmed from a no-action alternative that assumed that the moratorium would have ended regardless. And I think as Your Honor pointed out, the moratorium didn't have an end date, an expiration date on its own terms. Instead, it was to be revoked only after, or modified or rescinded, only after Interior had completed an EIS that would evaluate reforms that it said were needed to the federal coal program. The EA's assumption that absent the Zinke order, leasing would simply have resumed under a prior leasing framework that Interior itself said needed reform without Interior first having assured itself that it would meet its statutory obligations was arbitrary. And this no-action alternative violated NEPA in much the same way that this court rejected in the 2010 Center for Biological Diversity case. So in that case, the court rejected a no-action alternative to a proposed land exchange that assumed that mining would occur in the same manner and to the same extent regardless of whether or not the land remained in federal ownership. Counsel, I'm wondering whether there's anything special about the use of the term moratorium. What if the Jewell order had said, in the interim, while we're preparing the PEIS, we're going to slow walk these. And then the Zinke order said, we're not going to slow walk them. I think the importance of the language of the Jewell order is in its legal and its practical effects. So as a legal matter, BLM was prevented from issuing most new coal leases. Under the Zinke order, that was reversed. And that legal impact is what informs both final agency action and major federal action in this case, and as well informs the consideration of what the practical environmental consequences of that decision was. Could your clients today sue and challenge the Halland order for not imposing a moratorium that you think is required? No. And whatever impact the Halland order had is unclear, and the Department of Interior isn't here today to tell us what impact there was. But when the Department of Interior appeared before the district court, a counsel was asked, what is the impact of the Halland order? And they said, well, we're no longer expediting coal leases, but we remain as free to issue new coal leases, BLM does today, after the Halland order, as we did immediately before the Halland order issued. For that reason, the Halland order didn't eliminate harm to my clients, didn't eliminate the potential for harm from future coal leasing, and didn't eliminate the potential for effectual relief. At the top of this exchange, I think you indicated that you could not sue currently and challenge the Halland order. Why do you think that? I'm not aware of any impact that would give rise to my clients standing under the Halland order. And just to be frank, I don't know what the Halland order did. Nominally, revoked the Zinke order, but didn't revoke the actions that were embodied in the Zinke order, namely the one challenged by my clients to reopen federal public lands to coal leases with 20-year terms. But what's the source of that? I mean, getting, trying to get, again, sort of cycling back, circling back to the mootness issue, if you have uncertainty about the status of a moratorium, does that not rest on a challenge to the Halland order? No, the moratorium was put in place by the Jewell order, lifted by the Zinke order, and untouched by the Halland order. Our challenge is to the Zinke order and its decision to reopen public lands to coal leasing without first examining the environmental consequences of that decision, and that remains. Even though it's been revoked? The decision that we challenged was the decision to reopen public lands to coal leasing, the decision to revoke the moratorium. The Halland order didn't touch that core decision that we're challenging, and so it's our position that the Halland order has no impact on this case. Okay. May I address remedy briefly, Your Honor? Briefly, yes. Okay. Appellants complain that the district court remedy somehow constituted an injunction and ordered Interior to restart the Jewell order PEIS. And I want to be clear that the district court knew very well what it was doing. It was not instituting an injunction. It looked at the U.S. Supreme Court precedent, Monsanto, and the court's distinction between injunctions and vacater. Instead, by vacating the decision to lift the moratorium, the moratorium is reinstated unless and until Interior undertakes proper environmental review of a decision to, again, lift that moratorium. And, in fact, Interior has already shown that this remedy isn't difficult to decipher or implement because in May 2023, Interior finally commenced a NEPA process designed to evaluate the question at hand, which is whether or not to retain the moratorium on federal coal leasing. Until such review occurs, the moratorium is essential to minimize further unexamined environmental harm from coal leasing, and we ask this court to affirm. Okay. Thank you. And we'll hear a rebuttal. Thank you, Your Honor. I'll just start with the last point. Of course, it was an injunction. We started with a voluntary PEIS and pause, and now Interior can't lease any coal until the court says it can. So that clearly meets the definition of an injunction. Plaintiff's entire case is built on a house of cards, as this was a reset of a coal program, and that action just simply doesn't exist. California counsel admitted that there's broad discretion under the existing statute. That's exactly what they did under both secretarial orders about how they were going to process federal coal leases. There is no action for violations of the Juul order. This court found both in Whitewater that there was proper action against the Department of Homeland Security there for failure to comply with NEPA. DHS would have liability for noncompliance with NEPA or other federal law, not for its noncompliance with the manual that was challenged there. This Bennett second prong for final agency action wasn't met because, quote, the challenged action did not impose new legal requirements or alter the legal regime to which DHS is subject, end quote. And that's simply what happened here. With respect to opposing counsel, the PEIS was, I mean, the pause simply was just to do NEPA work. There was no determination, no findings. The whole point was determine what our policy should be. Should there be any changes whatsoever? There were just ideas thrown out there, including by the plaintiffs here, but there was no determination that any of that was necessary. On mootness, again, I think the court's right that this case is moot. The Zinke order is gone. The challenged conduct, the plaintiffs don't say what that is. What they really mean is the coal program. They don't want any federal coal leasing, but they don't challenge the coal program here. They challenge the Zinke order, and the Zinke order is gone. Last thing I'll say is that on, I'm sorry, two more quick things. On the PEIS, again, it's just semantics. The Juul order was the same as what the court ordered here and what plaintiffs look at. All that the court has to do is compare section four of the Juul order, which is what the PEIS was to include, against plaintiff's complaint for why the EA was insufficient. Those are the same factors, royalty rates, carbon budgeting, things that go beyond simple air or climate effects. Last thing is that this case is really important to reverse because the district court endorsed abuse of NEPA and programmatic challenges that this court has rejected, including in Whitewater and other cases. If this secretarial order is challengeable, it's hard to draw a line as to what other types of final agency actions would be challenged. It would really create a freeze in the regulatory processes because any change in policy, however it's communicated, would simply trigger NEPA review, and it would have to be paused as part of this change in administration policy, whatever. That's just simply not what happened here, unless the court has more questions. I ask that the court reverse the district court for lack of jurisdiction or for lack of a NEPA violation and, at a minimum, dissolve the mandatory injunction. Counsel, I have a question. You say we should reverse the district court order. I have the same point I was raising earlier. Why can't we just vacate the district court order so we're not making a substantive determination on the environmental issues? Your Honor, I may have misspoken. I believe the court could vacate the district court order for mootness or other lack of subject matter jurisdiction without ruling on the merits of the NEPA claims here. Do you think? Yes, Your Honor, and that could be on mootness or lack final agency action, any of those grounds. If the court does get to NEPA, we find that what the interior did did satisfy NEPA if it was triggered. Okay, I want to thank all counsel for the briefing and argument in this case, and this matter is submitted, and we will stand in recess until tomorrow morning. Thank you, Your Honor.
judges: GOULD, BYBEE, BRESS